**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Nathan Osai Williams,                                    Civ. No. 14-616 (PAM/JJK)

       Plaintiff,

v.                                                                         **REPORT AND**
                                                                              **RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security,

       Defendant.

Lionel H. Peabody, Esq., Peabody Law Office, counsel for Plaintiff;

Ann M. Bildtsen, Esq., Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Nathan Osai Williams seeks

judicial review of the final decision of the Commissioner of Social Security ("the

Commissioner"), who denied Plaintiff's application for supplemental security

income.  This matter is before the Court on the parties' cross-motions for

summary judgment.  (Doc. Nos. 12, 14.)  This matter has been referred to the

undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and

D. Minn. L.R. 72.1. For the reasons stated below, this Court recommends that

Plaintiff's motion for summary judgment be denied and Defendant's motion for

summary judgment be granted.

## BACKGROUND

### I.    Procedural History

Plaintiff protectively filed an application for a period of disability, disability insurance, and supplemental security income on March 17, 2011, alleging a disability onset date of October 3, 2003.  (Tr. 160–67.)[1]  The Social Security Administration ("SSA") denied Plaintiff's claim initially and on reconsideration. (Tr. 75–96, 97-122.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), and the hearing was held on January 29, 2013.  (Tr. 83–84, 34–61.)  At the hearing, Plaintiff amended the alleged onset date of disability to March 11, 2013, waiving his applications for a period of disability and disability insurance benefits.  (Tr. 33-34.)  Accordingly, the ALJ dismissed the waived portion of Plaintiff's application and addressed only his pending application for supplemental security income, as of March 17, 2011, the amended alleged onset date of disability.  (Tr. 13.)  The ALJ issued an unfavorable decision on Plaintiff's application.  (Tr. 10–22.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on January 15, 2014.  (Tr. 1–5.) Denial by the Appeals Council made the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.

---

[1]     Throughout this Report and Recommendation, the Court refers to the Administrative Record (Doc. No. 11) using the abbreviation "Tr."

## II.    Statement of Facts

Plaintiff, born on June 12, 1975, was thirty-five years old on the onset date of disability, March 17, 2011.  (Tr. 160.)  Plaintiff has a G.E.D. and has previously worked as a fork lift operator, a janitor, a sales representative, in shipping and receiving, and in a warehouse.  (Tr. 204, 217–24.)  He suffers from lumbar facet disease, major depressive disorder, generalized anxiety disorder, posttraumatic stress disorder and a history of polysubstance abuse. (Tr. 574, 562-66.) Plaintiff's appeal concerns only his mental-health impairments.

Before applying for supplemental security income, Plaintiff had not received treatment for his mental impairments in his adult life.  (Tr. 263.)  To initiate his application, he completed a Disability Report for the SSA.  (Tr.  201– 08.)  In the report, Plaintiff asserted that he was last employed as warehouse packager in 2003, but that his symptoms of post-traumatic stress disorder, depression, and anger problems limited his ability to work.  (Tr. 203–04.)  In February 2011, Accend Services evaluated Plaintiff and began providing him therapy; he had a pending evaluation scheduled with Nystrom and Associates. (Tr. 206–07.)

Plaintiff also completed a Function Report for the SSA. (Tr. 209–16.)  He reported that his conditions impaired his ability to complete job applications, to follow orders from superiors, and to avoid aggressive or uncontrollable behavior at work. (Tr. 209.)   He further reported that he had trouble getting a full night's rest due to night terrors.  (Tr. 210.)  His daily activities included eating breakfast,

walking his kids to school, working on job applications, walking, and spending time with his kids again after school.  (Tr. 210.)  He reported caring for his kids by feeding them, playing games, and teaching them responsibility.  (Tr. 210.)  He was able to prepare his own meals and complete house and yard work when not angry or depressed, and when he was assisted by verbal reminders and encouragement.  (Tr. 211.)  He shopped once a week, for an hour or so, though he had difficulty following through on plans and budgeting.  (Tr. 212–13.)  He noted hobbies and interests in fishing, drawing, watching movies, and spending time with his children. (Tr. 213.)  He reported limitations with talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others, all related to his mental health impairments; however, he was able to follow written instructions "well."  (Tr. 214.)  He described fear of confrontation and authority figures and a propensity to fight.  (Tr. 215.)  Finally, he reported observing violent behavior at home and experiencing physical and sexual abuse as a child.  (Tr. 216.)

Plaintiff's Work History Report, completed for the SSA, describes former employment from 1996 until 2005 as a fork lift driver, in shipping, receiving and packaging, as a janitor, as a sales representative, and in warehouse tasks. (Tr. 217–24.) Among other responsibilities, his various positions required him to: stock, ship, and package merchandise; assist customers; and oversee cash registers.  (Tr. 218–23.)

### A.    Medical Records

Initial evaluations, physical examinations, and ongoing treatment notes comprise the medical records relevant to Plaintiff's appeal. They contain both objective medical evidence and opinion evidence from treating and examining providers.

### 1.    Evaluations and Diagnoses of Mental Impairments

Plaintiff completed an Adult Mental Health Services Assessment in February 2011 with Accend Services.  (Tr. 263.)  Plaintiff sought mental-health services due to his difficulty holding a job and a stable residence; he reported being homeless at the time.  (Tr. 269.)  To Accend Services, he expressed interest in stabilizing his income, either in the form of disability benefits or a long-term job.  (Tr. 269.)  Describing his symptoms, he noted social withdrawal, difficulty concentrating, racing thoughts, insomnia, irritability, and inability to control his violent reactions.  (Tr. 265.)  Accend Services noted that Plaintiff was scattered, tense, and distractible, but also oriented, cooperative, and logical. (Tr. 267.)  Accend Services diagnosed him with Posttraumatic Stress Disorder and Bipolar I Disorder.  (Tr. 268.)

Accend Services referred Plaintiff to Nystrom and Associates for psychological testing, which he completed over multiple evaluative sessions[2] in

---

[2]      Nystrom and Associates administered the following diagnostic assessments: Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2); Millon Clinical Multiaxial Inventory, Third Edition (MCMI-III); Wechsler Adult Intelligence Scale, Fourth

(Footnote Continued on Next Page)

June and July of 2011.  (Tr. 325–43.)  On assessment, Plaintiff was neatly

dressed, calm, cooperative, and alert and oriented, though he stuttered at times

during the interview portion.  (Tr. 327.)  Describing his current functioning,

Plaintiff reported symptoms of depression, uncontrollable rage, disorganization,

forgetfulness, and hypervigilence.  (Tr. 332–33.)  Throughout testing, Plaintiff

appeared to understand the instructions given and sat quietly while completing

the assessment. (Tr. 336–38.)  Following the diagnostic results, Nystrom and

Associates diagnosed him with: Major Depressive Disorder, Recurrent,

Moderate; Generalized Anxiety Disorder; and Post-traumatic Stress Disorder.

(Tr. 333, 342.)  Upon receiving the results, he asked to begin individual therapy

and was scheduled for weekly sessions. (Tr. 336.)

In July 2011, Plaintiff saw psychologist Marcus Desmonde for a Social

Security consultative psychological evaluation.  (Tr. 289–91.)  Though he

reported being homeless in February, by July he had secured housing at a local

boarding house. (Tr. 263; 289.)  Plaintiff reported that he maintained a regular

schedule of waking up between 9:00am and 10:00am, spending time with his

children at their mother's home, staying for lunch and dinner, and returning to the

boarding house to get to sleep by 12:00am.  (Tr. 289–90.)  Dr. Desmonde

reported that, on exam, Plaintiff was open, spontaneous, and uninhibited; he

---

(Footnote Continued from Previous Page)
Edition (WAIS-IV); Integrated Visual and Auditory Continuous Performance Tests (IVA);
Conners Adult ADHD Rating Scale (CAARS).

came casually dressed with good hygiene. (Tr. 290.) He reported past symptoms of depression, difficulty with anger and self-medication with cannabis; his current symptoms included occasional sleep disturbance and low frustration tolerance. (Tr. 290) Dr. Desmonde estimated Plaintiff's IQ as between 75 and 85. (Tr. 290) Ultimately, he diagnosed Plaintiff with Adjustment Disorder of adolescence and adulthood with mixed disturbance of emotions and conduct, Cannabis abuse by history, Posttraumatic stress disorder by history, and he noted moderate psychosocial stressors due to homelessness and difficulty obtaining full-time employment. (Tr. 291.) Dr. Desmonde found that Plaintiff was in touch with reality and oriented to day and month, though not the exact day. (Tr. 290.) Memory assessment showed that Plaintiff recalled five digits forward and three digits backward, he computed serial seven additions, and he recalled two out of three objects immediately, within five minutes and after thirty minutes. (Tr. 290.) Dr. Desmonde found that, given mental health support, Plaintiff was capable of understanding simple instructions, brief social interactions and tolerating the stress of competitive employment within his capabilities. (Tr. 290.)

2.    Physical Exam

In May 2011, Plaintiff underwent a complete physical exam by Dr. Hind Tabit, a primary care physician. With Dr. Tabit, Plaintiff discussed his previous use of intravenous drugs, cocaine, heroin, methamphetamine, and prescription pills; he reported abstinence from them for the previous six months. (Tr. 294.) In his summary of the exam, Dr. Tabit referred to drug abuse and noted that Plaintiff

was "in the process of quitting."  (Tr. 296.)  Dr. Tabit found that Plaintiff was alert

and had a healthy appearance.  (Tr. 295.)

### 3.    Records Relating to Treating Relationship: Ali Rassa, Counselor

Following its assessment of Plaintiff's mental health, Accend Services

drafted an ARMHS Services plan for Plaintiff, authorizing four hours of weekly

services, coordinated by counselor Ali Rassa.  (Tr. 276–87.) Accend Services

intended to teach Plaintiff symptom management, socialization, and leisure skills.

(Tr. 279.) Mr. Rassa provided Plaintiff with resources to learn these skills and

they worked on incremental goals, such as "make and keep a 24-hour

commitment to act calm." (Tr. 374.)  By June 2011, Plaintiff was able to catch

and check anger with his children and their mother and to engage in their

activities. (Tr. 405.)

Plaintiff followed Mr. Rassa to his new employer, the Human Development

Center, where the two completed a Functional Assessment in October 2011.

(Tr. 385; 344–46.)  Plaintiff's health had improved due to regular exercise, he

was routinely caring for his children, and had little trouble with activities of daily

living; though he remained socially limited, he was aware of his mental health

symptoms and was engaged in treatment. (Tr. 344–45.)  In weekly progress

notes Mr. Rassa repeatedly noted Plaintiff's incorporation of positive coping skills

and improved communication tactics.  (Tr. 347–57.)  By December 2011, Plaintiff

had seen the positive effects of his coping behavior and the benefits to

controlling his aggression; he was using the mechanisms he had learned to reduce his anxiety. (Tr. 425–30.) Plaintiff reported to Mr. Rassa that he fought inclinations to act defensively at his Rule 25 chemical dependency assessment by rethinking his behavior and concluded that it had gone well. (Tr. 434.) In his December 30, 2011 Functional Assessment, Mr. Rassa noted that Plaintiff had begun Rule 25 treatment for marijuana use. (Tr. 431.)

In January 2012, though he reported low self-esteem to Mr. Rassa, Plaintiff noted how different he was and how much he had improved in the previous year. (Tr. 440.) By February 2012, he reported to Mr. Rassa that his anger was "not really an issue" since learning and using coping skills. (Tr. 443.) At a children's birthday party, Plaintiff was able to recognize why crowds overwhelmed him and he used reasoning to suppress negative inclinations and concentrate on the party; though it was exhausting, he sustained control over his symptoms for four hours without a break. (Tr. 444–45.)

In March 2012, Plaintiff was reevaluated for ARMHS eligibility by psychotherapist Carol Johnson at The Human Development Center. (Tr. 450–54.) Ms. Johnson documented that Plaintiff was very personable, an excellent listener and had done an outstanding job of explaining his symptoms and his methods of managing them. (Tr. 452.) He continued to need ARMHS support in managing his symptoms, particularly sleep disturbance, but he had made large strides in understanding and coping with his mental health impairments. (Tr. 454.) At that point, Plaintiff had abstained from using marijuana for over six

weeks.  (Tr. 451.)  Plaintiff told Mr. Rassa that he could not have endured the assessment three months earlier, but the skills he had gleaned from the ARMHS services had enabled him to do so. (Tr. 457.)   He also told Mr. Rassa that he was much happier when he was able to use his coping skills. (Tr. 458–59.)

In April 2012, Plaintiff continued to report progress and the positive benefits of controlling his anger; though he was stressed by trying to quit smoking, he was able to control his anger and enjoy quality time with his children.  (Tr. 460–64.)  In May 2012, Mr. Rassa noted that Plaintiff considered discontinuing ARMHS services in light of his progress.  (Tr. 465.)  By early June 2012, Plaintiff and Mr. Rassa transitioned into meeting every two weeks to continue to discuss chemical dependency treatment and therapy progress. (Tr. 549.)  In June 2012, Plaintiff worked with Mr. Rassa to draft a letter to vacate his apartment so he could move in with his partner and their children. (Tr. 550.) In July and August 2012, they discussed the process for expunging criminal records, which Plaintiff investigated independently.  (Tr. 552-53.)

In September 2012, Plaintiff underwent another Functional Assessment with Mr. Rassa at the Human Development Center, which was differs selectively from the previous Assessment. (Tr. 554–56.)  In September 2012, Plaintiff did not take medications for his mental-health impairments, but he was able to manage his impairments by using healthy coping skills.  (Tr. 554)  Mr. Rassa noted that Plaintiff's mental health symptoms barred him from acquiring and keeping employment but that Plaintiff was interested in being employed once his

symptoms were under control. (Tr. 554.)  Reviewing the Assessment with

Plaintiff, Mr. Rassa noted that Plaintiff great input and was very open and

engaging.  (Tr. 558.)  Plaintiff reported to Mr. Rassa that he became bored while

his children were in school and was interested in seeking a part-time job.

(Tr. 559.)  By October 2012, he had begun taking classes at the Minnesota Work

Center.  (Tr. 560.)

> 4.    Records Relating to Treating Relationship: Kimberly Lunde,
>        Psychotherapist

In September 2011, Nystrom and Associates noted that Plaintiff's

unmanaged depressive and anxiety symptoms had a significant negative impact

on his ability to accomplish goals; he needed to develop improved symptom

management skills.  (Tr. 411–12.)  That same month, Plaintiff began weekly

therapy sessions with psychotherapist Kimberly Lunde.  (Tr. 325–43; 501.)  At

their first Ms. Lunde found him stable, talkative, and engaged.  (Tr. 501.)

Following initial progress with positive-thinking strategies, in October 2011

Ms. Lunde twice noted that Plaintiff had suicidal ideation with no plan to act, for

which they discussed a safety plan. (Tr. 502–11.)  At that time, Ms. Lunde

observed that Plaintiff's past trauma impairs his social functioning and his

symptoms of anxiety and depression caused serious impairment in occupational

functioning.  (Tr. 511.)

In November 2011, Ms. Lunde noted that Plaintiff still exhibited symptoms

of post-traumatic stress disorder, anxiety, and depression. (Tr. 515.)  Shortly

after, she referred Plaintiff for a medication consultation; however, he elected not to take the prescribed medications due to his history of substance abuse. (Tr. 518–24; 526.)  Through cognitive behavioral therapy and positive coping techniques, Plaintiff achieved slight or moderate improvement each session through the end of 2011; Ms. Lunde noted that he appeared in better spirits, smiled at times during his sessions, and was excited to discuss therapeutic topics.  (Tr. 525–28.)

In January 2012, despite irritability, Plaintiff reported that he was coping well with techniques discussed in treatment; he had attended a social function with his children for the first time.  (Tr. 531.)  In April 2012, Plaintiff applied a plan developed with Ms. Lunde to avoid resorting to violence with his neighbors in a recent conflict. (Tr. 539.) In June 2012, he reported recurring nightmares that had triggered aggression, though he agreed with Ms. Lunde to use positive coping skills to avoid harm.  (Tr. 540.)  In August 2012, Plaintiff discussed being an example for his children for proper anger management, considered couples therapy with his partner and exercising to reduce stress.  (Tr. 542.)  He had a routine of going to the gym and had started cooking supper; he continued to report agitation and aggressive tendencies, though he worked with Ms. Lunde to avoid harm.  (Tr. 546.)

In September 2012, Plaintiff reported to Ms. Lunde that he had broken several dishes during a recent episode of frustration; though he had yelled at his son, he had apologized and was able to understand the effect of his symptoms

on himself and others. (Tr. 578.)  He and Ms. Lunde developed a scale to rate his anger throughout the day, to increase his awareness and manage his symptoms. (Tr. 579.)  He reported making strides in his relationship and worked on parenting techniques which reflected his developments in therapy. (Tr. 581.)  By October, he reported that he had gotten used to his symptoms and no longer self-medicated to remedy them; he was "proud of himself" for responding well to previous triggers. (Tr. 582.) He reported having more energy and making dinner as much as seven days per week; when discouraged, Ms. Lunde discussed Plaintiff's children and their fondness for their "new dad." (Tr. 587.) By November 2012, he had returned to exercising regularly and was regularly using coping skills to tranquilize himself. (Tr. 588–91.)

### 5.    Additional Relevant Records

In June 2012, Plaintiff saw Dr. Mostafa Farache, complaining of facial numbness.  (Tr. 481–83.) Plaintiff reported memory loss, recent forgetfulness, depressive symptoms, insomnia, and marijuana use.  (Tr. 481.)  His head CT scan was negative; Dr. Farache believed that Plaintiff's numbness was likely psychosomatic.  (Tr. 482.)  Dr. Farache further noted that Plaintiff's mental-health symptoms were not well controlled; he referred Plaintiff for neuropsychological evaluation of cognitive deficits linked to his past trauma and drug use. (Tr. 481-82.)

In July 2012, Plaintiff underwent a neurological evaluation of cognitive difficulties conducted by Dr. Michael Sharland, which entailed an interview and

administration of nineteen distinct neurological tests.[3] (Tr. 562.) In addition to his diagnosed psychological issues, he reported current difficulty with short-term memory, irritability, and attention span. (Tr. 562.) Dr. Sharland summarized that Plaintiff performed at normal levels, but exhibited mild attention and memory retrieval deficits, which reflected an abnormal neuropsychological profile. (Tr. 565.) He believed that Plaintiff's significant psychological issues resulted in his memory retrieval deficits, but that he had no brain damage or illness and his cognitive ability increased with improved mood. (Tr. 565)

### B.  Pertinent Opinions: Plaintiff's Functional Capacity

In July 2011, Dr. Desmonde, who conducted a disability evaluation for Plaintiff, found that, given mental-health support, Plaintiff was capable of understanding simple instructions, carrying out simple tasks, interacting briefly with others, and tolerating the stress of competitive employment. (Tr. 291.) The same month, State consultative examiners concluded Plaintiff was able to follow routine, repetitive tasks of three to four steps and brief, superficial contact with coworkers. (Tr. 82–84.) In a September 2011 medical opinion, Trevor

---

[3]     Dr. Sharland administered the following tests: (1) Mini-Mental Status examination; (2) Wechsler Adult Intelligence Scale—4th edition; (3) Wide Range Achievement Test—4th edition; (5) NAB Naming; (6) Wechsler Memory Scale—4th edition; (6) California Verbal Learning Test—2nd edition; (7) Controlled Oral Word Association; (8) Stroop Test; (9) Trail Making Test; (10) Wisconsin Card Sorting Test; (11) Brief Test of Attention; (12) Digit Vigilance Test; (13) Test of Memory and Malingering; (14) Dot Counting Test; (15) Victoria Symptom Validity Test; (16) Beck Depression Inventory—2nd edition; (17) Beck Anxiety Inventory; (18) Personality Assessment Inventory; (19) Conners Continuous Performance Test—2nd edition.

Swaverland, Plaintiff's clinical supervisor at Accend Services, concluded that

Plaintiff had a lasting mental illness and would not be able to perform any

employment in the foreseeable future.  (Tr. 414.)  In November 2011,

psychotherapist Kimberly Lunde opined that Plaintiff's psychological problems

would significantly impair his ability to be employed for the foreseeable future and

that his symptoms interfered with his overall daily functioning.  (Tr. 417–18.)  In

January 2012, counselor Ali Rassa reported that Plaintiff had trouble making and

keeping appointments, communicating and accepting criticism, but that he

regularly cared for his children and maintained a positive involvement in their

lives.  (Tr. 423-24.)

## III.    Administrative Hearing Testimony

### A.    Plaintiff's Testimony

On January 29, 2013, Plaintiff testified to the following at a video hearing

before Administrative Law Judge Paul Gaughen.  (Tr. 28–52.)  At the time of the

hearing, he lived in an apartment with his six-year-old daughter, his eleven-year-

old son, and their mother.  (Tr. 34–35.)  Plaintiff had received his G.E.D.,

however he was not regularly managing his own bills or checkbook.  (Tr. 35–36.)

Typically, he began each day by mentally preparing himself for half an hour, then

he would occasionally help his partner to prepare their children for school, and

proceed to work on therapy exercises.  (Tr. 37.)  His family's income consisted of

MFIP, which they supplemented with his partner's student loans.  (Tr. 36–37.)

Plaintiff explained that he had been seeing a therapist and a case manager for a two-year period leading up to the hearing and that, at the time of the hearing, he was seeing a therapist weekly and his case manager biweekly. (Tr. 37–38.)   Plaintiff's case worker had recommended he seek a therapist, with whom he had worked on rehabilitating his daily functioning.  (Tr. 39–40.)  Though initially Plaintiff had seen his case manager up to twice weekly, the two gradually agreed to less frequent meetings to account for Plaintiff's therapy schedule. (Tr. 38–39.)  From the beginning of therapy he had worked to transition out of his previous lifestyle of drug addiction and neglectful parenting into a new social identity as a responsible and attentive parent; many of his efforts were for the sake of his children.  (Tr. 40–42.)  Through receiving therapy, he aimed to rehabilitate his daily functioning, which he believed was impaired by his difficulty with anger management. (Tr. 40.)

Plaintiff specifically reported difficulty with the circumstances which triggered reactive behavior; among the triggers were certain responses from his children, questioning by authority figures, and frustration completing tasks. (Tr. 40.)  Depending on the specific situation, his noted triggers produced increased anxiety, and the responsive behavior he learned as a child was "not conducive to modern society."  (Tr. 41.)   In the context of daily chores, Plaintiff stated he would respond to frustration by causing physical harm to himself or the surrounding environment, destroying dishes for example.  (Tr. 41.)  Though the

chores themselves were not difficult, he found achieving goals mentally taxing. (Tr. 42.)

Plaintiff testified that, depending on how he felt each day, he offered limited help in shopping and caring for the children.  (Tr. 42.)  He stated that his inability to adequately control his temper restricted his interaction with his children and his participation in their activities.  (Tr. 43.)  He reported losing his temper at home as recently as that morning, for which he had apologized to his family.  (Tr. 43.)

Though Plaintiff reported avoiding the gym because of the number of people there, when he had gone to the gym he experienced unexplained back pain and related symptoms.  (Tr. 44.)  After an MRI was conducted to assess the source of his pain, Plaintiff began an eight-week course of physical therapy entailing one two-hour session per week.  (Tr. 45.)

Plaintiff began using illegal narcotics when he was sixteen years old; at the time of the hearing he had been sober for over two years. (Tr. 45–46.)  Despite his mental-health symptoms and back pain, he did not take prescription medications due to apprehension surrounding their adverse affects, apprehension he attributed to past negative experience with illegal drug use. (Tr. 45.)

When asked why he felt he was unable to work, Plaintiff stated that he could not perform his past work due to his reactive behavior when triggered. (Tr. 46.)  In a laborer position, he noted, his retaliative threats and tendency to

lash out when overwhelmed would not be tolerated.  (Tr. 46.)  He believed he

could be a "team player," but that there would be days when his responsive

behavior, even in normal employment situations, would be inappropriate.

(Tr. 46.)

### B. Vocational Expert's Testimony

Edward Utities testified as a Vocational Expert ("VE") at the hearing.

(Tr. 47–51.)  Mr. Utities first offered his analysis of Plaintiff's past work as a

janitor, packager, forklift operator, lumber yard worker and retail clerk. (Tr. 47–

48.) For the purposes of presenting hypothetical questions, the ALJ asked the VE

to assume the following individual of Plaintiff's age, work history, and education

level with no exertional limitations:

> [I]n work environments, he can understand, remember, and apply to
> work previously acquired information from work or his education, but
> with regard to new learning, he would be limited to learning at a
> regular pace and applying to work new, rather simple, and clear cut
> instructions, rules having no more than about four to five steps.
> Stated another way, he can't handle and absorb readily new detailed
> information, or do complex memory tasks et cetera.
>
> Now, the worker can handle usual work stressors, such as
> showing up appropriately groomed and ready to work. Conversely,
> this worker could not handle unusual work stressors, such as being
> subjected to dangerous work conditions, driving dangerous industrial
> equipment, being subjected to requirements such as mandatory
> overtime, or, as a regularly anticipated part of business, having to
> deal with unruly or contentious persons on a regular basis.
>
> . . .
>
> [H]e needs a rather well set routine with few surprises and the
> benefit of a supervisor. Stated another way, he would not be a

candidate for independent work where wherein he sets his own schedule et cetera.

He could not engage in higher level of social interactions or make sophisticated judgments if required by an occupation, but conversely, he can engage in routine, or perfunctory social interactions with coworkers, supervisors and or the retail public.

(Tr. 48–49.)  Given the hypothetical individual's limitations, the ALJ asked the VE whether Plaintiff's past relevant work was performable. The VE ruled out forklift operator, lumber-yard worker, and retail clerk, as beyond the limiting parameters. (Tr. 49.)  He then opined that the hypothetical individual could, however, perform Plaintiff's past work as a janitor or a packager, both unskilled occupations entailing rote cleaning or packaging functions.  (Tr. 49.)

For the purposes of the ALJ's second hypothetical, he asked the VE to assume the following variation from the previous hypothetical individual:

[T]he exertion capacity is, for medium exertion, as defined in the Dictionary in the Occupation Titles, and, if this wasn't implicit in the [first hypothetical individual's limitations], this worker performs best if left, essentially, alone to perform basic work functions with little collaboration from others, but he can work in a center or places where others are performing their work duties, and that's just to amplify, to some extent, or perhaps, just to be redundant, the previous behavioral limitations.

(Tr. 50.) The VE responded that his opinion on the hypothetical individual's ability to perform Plaintiff's past work would not change under the second hypothetical. (Tr. 50.)

Plaintiff's attorney then posed two additional limitations, and asked the VE whether they would affect an individual's ability to perform the work of a janitor or

a packager.  (Tr. 50–51.) The VE opined that the first limitation, inability to

maintain concentration for more than two hours, would affect an individual's

capacity to perform the work of either position.  (Tr. 51.)   He testified that the

second limitation, inability to ask simple questions of a supervisor, would also

affect the individual's capacity to perform the work of a janitor or packager.

(Tr. 51.)  He expounded that, once a person learns to perform the work of a

packaging position, it becomes a rote function; if a person continued to ask

frequent, simple questions about his own work after grasping the functions of the

job, most employers would find it unacceptable.  (Tr. 51.)

## IV.    The ALJ's Findings and Decision

On February 8, 2013, the ALJ issued a decision denying Plaintiff's

application for SSI.  (Tr. 10–22.)  He concluded that Plaintiff was not disabled

under the definition of the Social Security Act at any time between March 17,

2011, the date he applied for SSI, and the date of his decision.  (Tr. 22.)  To

arrive at his decision, the ALJ followed the five-step procedure for determining

whether an individual is disabled.  *See* 20 C.F.R. § 404.1520 (a).

At step one, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since his amended alleged onset date of March 17, 2011.

(Tr. 15.)  At step two, the ALJ determined that Plaintiff had the following severe

impairments: lumbar facet disease, major depressive disorder, generalized

anxiety disorder, post-traumatic stress disorder and history of polysubstance

abuse.  (Tr. 15–16.)  At step three, the ALJ found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled one of

the listed impairments in 20 C.F.R., Part 404, Subpart P, App. 1. (Tr. 16–18.)

The ALJ reasoned that, before proceeding to steps four and five, determination

of Plaintiff's residual functional capacity (RFC) required a more detailed

assessment, which entailed itemizing functions from the broad paragraph B

criteria for adult mental disorder under 12.00 of the Listing of Impairments.

(Tr. 18.)

The ALJ conducted a two-step evaluation of Plaintiff's symptoms and their

consistency with objective medical evidence and other evidence[4] as required by

20 C.F.R. 416.929; he also considered opinion evidence. (Tr. 18.)  He first found

that Plaintiff's medically determinable impairments could reasonably be expected

to cause the alleged symptoms.  (Tr. 19.) He further found that Plaintiff's

statements concerning intensity, persistence and limiting effects of his

symptoms, however, were not entirely credible.  (Tr. 19.)  Notably inconsistent

with Plaintiff's statements of the effects of his mental health symptoms, the ALJ

found, was the mental status examination evidence evincing Plaintiff's consistent

and significant improvement with treatment and Plaintiff's reported activities of

daily living.  (Tr. 19.)  In reaching these findings, the ALJ assigned significant

weight to neuropsychological evaluator, Dr. Sharland, and consultative examiner,

---

[4]      Whenever Plaintiff's statements about the effects of pain or other
symptoms were not substantiated by objective medical evidence, the ALJ was
required to assess the credibility of such statements against the entire case
record.  (Tr. 18.)

Dr. Desmonde, and persuasive weight to the State agency psychological consultants.  (Tr. 19, 21.)  He afforded little weight to the opinions of counselor Mr. Rassa, psychotherapist Ms. Lunde, and clinical evaluator Mr. Swaverland, noting their inconsistency with the record as a whole.  (Tr. 20.)

The ALJ concluded that the Plaintiff had the RFC to perform medium work, as defined in 20 C.F.R. § 967(c), subject to the following limitations: he can understand, remember, and carry out new simple instructions with no more than four to five steps; cannot handle new detailed information or memory tasks; can apply to work at a regular pace previously applied information from work and education as well as new learning; can handle usual work stressors, but not unusual work stressors such as dangerous work conditions, driving dangerous industrial equipment, mandatory overtime or dealing with unruly or contentious persons on a regular basis; requires a well-set routine with few surprises, a supervisor, no independent work, no sophisticated judgments, and no higher-level social interaction; can engage in routine or perfunctory social interactions with coworkers, supervisors, and the public and work where others are performing their duties, but works best if left alone, with little collaboration from others.  (Tr. 18.)

Following his assessment of Plaintiff's RFC, the ALJ concluded the disability determination at step four of the sequence.  (Tr. 21.)  Relying on the VE's testimony, which he found highly credible, the ALJ determined that Plaintiff was capable of performing his past relevant work as a janitor and packager; this

work, he noted, would not require performance of work-related activities

precluded by Plaintiff's RFC.  (Tr. 21.)   Accordingly, the ALJ found Plaintiff was

not disabled under the Act from March 17, 2011, to February 8, 2013, the date of

his decision.  (Tr. 22.)

## DISCUSSION

### I.    Standard of Review

#### A.    Definition of Disability

Congress has prescribed the standards by which Social Security disability

benefits may be awarded.  "Disability" under the Social Security Act means the

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be

determined to be under a disability only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy[.]"

42 U.S.C. § 423(d)(2)(A).

The claimant bears the burden of proving his or her entitlement to disability

benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v.*

*Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d

255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she

cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second, that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

### B.   Substantial Evidence on the Record as a Whole

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reed v. Sullivan*, 988 F.2d 812, 814 (8th Cir. 1993) (internal quotation marks omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckely v. Adfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).)  "Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Id.* (quoting *Parsons v. Heckler*, 739 F.2d 1334, 1339 (8th Cir. 1984)).  In reviewing the administrative decision, "the substantiality

of evidence must take into account whatever in the record fairly detracts from its weight." *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citations omitted).

## C.    Source of Medical Opinion Evidence

When determining if a claimant is disabled, "the ALJ considers medical opinions along with 'the rest of the relevant evidence' in the record." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting 20 C.F.R. § 404.1527(b)). Medical opinions are statements from acceptable medical sources "that reflect judgments about the nature and severity of [claimant's] impairment(s), including [claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [claimant's physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Acceptable medical sources are licensed physicians, licensed

or certified psychologists, licensed podiatrists and qualified speech-language pathologists. 20 C.F.R. § 416.913(a)(1–5) (noting sources from whom evidence to establish an impairment will be accepted).

## II.    Analysis

Plaintiff alleges three errors by the ALJ. (Doc. No. 13, Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 24–36.)  He first argues that the ALJ failed to afford appropriate weight to the opinions of Plaintiff's treating mental-health providers, Ms. Lunde and Mr. Rassa.  (Pl.'s Mem. 24–34.)  Next, he argues that the ALJ failed to assess Plaintiff's credibility in the manner required by law.  (Pl.'s Mem. 34–35.)  Finally, he alleges that the ALJ failed to include all of Plaintiff's mental functional limitations in the hypothetical posed to the VE.  (Pl.'s Mem. 35–36.)  This Court will address each argument in turn.

### A.    Treating Providers' Opinions

Plaintiff argues that the ALJ erred by assigning little weight to his treating providers, Mr. Rassa and Ms. Lunde, and significant weight to evaluating sources Dr. Sharland and Dr. Desmonde. To support this argument, Plaintiff relies on Eighth Circuit decisions noting that, in appropriate cases, the opinions of treating providers who are not acceptable medical sources under Social Security regulations should still be given great weight, and may even outweigh the opinion of an acceptable medical source.  (Pl.'s Mem. 25 (citing *Duncan v. Barnhart*, 368 F.3d 820, 823 (8th Cir. 2004); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003); SSR 06-03p).)  Plaintiff appears to argue that, if great weight were given

26

to the opinions of Ms. Lunde and Mr. Rassa, they would override the opinions of Dr. Desmonde and Dr. Sharland, and support a conclusion that Plaintiff was more limited in his ability to work.

A treating provider's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record. *Pirtle v. Astrue*, 479 F.2d 931, 933 (8th Cir. 2007) (quoting *Prosch v Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000)). "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating [provider] has offered inconsistent opinions." *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001). If a provider's opinion is based largely on the claimant's subjective complaints—rather than on objective medical evidence—an ALJ may afford it less weight. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007). If the treating provider's opinion is not given controlling weight, the ALJ should consider the following factors: examining relationship, treatment relationship, length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability of opinion, consistency of the opinion with the record as a whole, specialization, or any other factors that support or contradict the opinion. 20 C.F.R. § 404.1527(d).

Undoubtedly, Ms. Lunde and Mr. Rassa were poised to offer informed reports of the manifestation of Plaintiff's mental-health symptoms as relayed to them by Plaintiff throughout the period of treatment. However, Plaintiff's

argument overestimates the impact of their opinions and fails to account for the lack of supporting diagnostic evidence. Based on her treatment sessions with Plaintiff, Ms. Lunde reported that Plaintiff's psychological problems significantly interfere with his daily functioning and that he would be unable to sustain employment. (Tr. 417–18; 257.)  She additionally submitted a form assessment of his mental limitations. (Tr. 419–21.)  Mr. Rassa explained that he could not comment on Plaintiff's barriers to employment, but he reported that Plaintiff had frequent anxiety and stress surrounding making and keeping appointments, that they had worked on communication skills, and that Plaintiff had limited socialization opportunities.  (Tr. 423.)   In his later opinion, Mr. Rassa reiterated Plaintiff's difficulties with appointments and communication under stress, but that Plaintiff could provide limited care for his kids and supported their mother in caring for them.  (Tr. 258–59.)  These opinions are reflective of the unique insight of a treating provider; yet, they fail to incorporate the "medically acceptable clinical and laboratory and diagnostic techniques" required to assign controlling weight to a treating provider's opinion.  Moreover, they are derived from a series of therapeutic interactions with Plaintiff, in which Plaintiff reported and discussed his perceived struggles. Thus, the ALJ correctly concluded that not only were the opinions not entitled to controlling weight, that their basis on Plaintiff's subjective complaints warranted less weight still.  *See Holmstrom*, 270 F.3d at 720; *Kirby*, 500 F.3d at 709.

Moreover, other evidence in the record supported the ALJ's conclusion. Specifically, Dr. Desmonde and Dr. Sharland weighed in on Plaintiff's limitations in the context of medically acceptable diagnostic techniques. Dr. Desmonde administered a psychological evaluation informed with Plaintiff's recent history and concluded that Plaintiff could understand simple instructions, interact briefly with others, and tolerate the stress and pressure of competitive employment with the support of behavioral health services.  (Tr. 291.)  Similarly, Dr. Sharland administered a series of diagnostic tests.  (Tr. 565.)  From his assessment he reported that Plaintiff performed at average levels in most cognitive measures; though Plaintiff exhibited mild deficits in attention and memory retrieval, he could expect improvement with improvements in his depressed and anxious mood. (Tr. 565.)

The ALJ's evaluation and assignment of weight regarding each source is supported by the substantial evidence on the record as a whole, and complied with the law governing these circumstances. Because the treating providers' opinions were based on Plaintiff's subjective complaints and superior medical evidence contradicted those opinions, the ALJ properly discounted the opinions of Plaintiff's treating providers.  Upon making this determination, the ALJ assigned the weight he found appropriate in light of the record as a whole, and then the ALJ assessed the examining-source opinions, giving appropriate regard for their diagnostic support.

Plaintiff contends that the ALJ did not state proper reasons for discounting the opinions of his treating providers.  (Pl.'s Mem. 25.)  The Court disagrees.  In reference to the weight given to the treating providers, the ALJ's findings explicitly rest on the availability of superior evidence and the inherent inconsistency of the treating-source opinions. ALJ assigned little weight to the opinions of Mr. Rassa, Ms. Lunde, and Mr. Swaverland, explaining how their opinions conflicted with the record as a whole.  In particular, the ALJ noted that Ms. Lunde's and Mr. Rassa's opinions regarding Plaintiff's inability to continue working contradicted their own observations that Plaintiff's symptoms and reported activities of daily living improved with treatment.  In giving Dr. Sharland's opinion significant weight, the ALJ cited its consistency with Dr. Sharland's examination findings and the weight of the evidence of record. In giving Dr. Desmonde's opinion significant weight, the ALJ cited the opinion's consistency with Dr. Desmonde's mental status examination findings and the claimant's documented improvement with therapy.  In other words, this Court concludes that the ALJ gave good reasons for discounting the treating sources' opinions and assigning significant weight to other medical evidence in the record. *See Brown v. Astrue*, 611 F.3d 941, 951–52 (8th Cir.2010) ("When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so.").

Accordingly, this Court concludes that the ALJ's assessment of each source and the respective weight assigned to each was supported by substantial evidence on the record as a whole.

## B.    Assessment of Plaintiff's Credibility

Plaintiff next asserts that the ALJ erred in discounting his credibility and that the ALJ's ultimate credibility determination is not supported by the substantial evidence on the record as a whole. A claimant's subjective complaints cannot be discounted solely on the basis of lack of objective findings to support the severity of his complaints. *Polaski v. Heckler*, 739 F.3d 1320, 1322 (8th Cir. 1984).  An ALJ must consider, but need not discuss, each of the following factors in making a credibility assessment: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009).  When an ALJ provides good reasons for his credibility finding, courts should defer to that finding, because the ALJ is responsible for deciding questions of fact. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007).

The ALJ began his credibility assessment by acknowledging Plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms.  (Tr. 18-19.)  He found that Plaintiff's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms; however [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons [he proceeded to discuss]." (Tr. 19.)  For the reasons that follow, the Court concludes that the ALJ's credibility determination was supported by substantial evidence on the record as a whole.

The presence of significant evidence that Plaintiff's mental-health symptoms improved with consistent treatment informed the ALJ's finding that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were less than entirely credible.  (Tr. 19.)  "'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'"  *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)).  An ALJ can reasonably consider the effect treatment has on a claimant's symptoms in assessing the credibility of the claimant's statements about his symptoms' limiting effects.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (citing *Brown*, 611 F.3d at 955, and discussing how the ALJ properly considered that the claimant's physical symptoms "improved with treatment" in discounting the claimant's credibility).  Thus, there was nothing improper in the ALJ's observation that treatment records from 2011 through 2012 reflected consistent improvement in Plaintiff's mental-health symptoms as a factor in his credibility determination.

The ALJ also analyzed Plaintiff's own description of his daily activities in assessing the credibility of Plaintiff's statements about the severity of his symptoms.  For example, the ALJ observed that Plaintiff's ability to spend time with his children, take his children to the park, attend sporting events, and the gym regularly conflicted with his statements that he had trouble being in public. (Tr. 20.)  Based on this Court's review of the record, there was substantial evidence on the record as a whole to support the ALJ's finding that the inconsistency between Plaintiff's own account of his daily activities and his assertion of disability weighed against his credibility.  *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) ("[A]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.").

Although the ALJ did not explicitly couch his observation that objective medical evidence supported a finding that Plaintiff's mental-health symptoms were not severe enough to prevent him from working as part of a credibility determination, the ALJ's credibility ruling is further supported by such evidence. For example, the ALJ noted that a neuropsychological evaluation of Plaintiff by Dr. Sharland found only mild deficits in Plaintiff's attention and memory retrieval due to psychological issues.  (Tr. 21.)  The ALJ also noted the consistency between Dr. Desmonde's mental status examination and his conclusions that Plaintiff could interact briefly with others, tolerate the stress and pressure of competitive employment, and understand, remember, and follow simple instructions.  (Tr. 21.)  This conflict between Plaintiff's subjective complaints and

the objective medical evidence in the record further supports the conclusion that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

Given the reasons provided by the ALJ for discounting Plaintiff's credibility and the deferential standard of review, *see Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."), this Court concludes that the ALJ's credibility ruling is supported by sufficient evidence on the record as a whole.

## C.     The Hypothetical Posed to the Vocational Expert

Plaintiff argues that the ALJ's hypothetical to the VE omitted several of Plaintiff's mental-health limitations that should have been included.  Essentially, Plaintiff contends that the hypothetical question was deficient because it should have incorporated a more restrictive residual functional capacity based on the opinions of Ms. Lunde and Mr. Rassa.  (*See* Pl.'s Mem. 35.)     "A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments."  *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010).  The hypothetical question must include "those impairments that the ALJ finds are substantially supported by the record as a whole."  *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).  As discussed above, the ALJ properly discounted Plaintiff's subjective complaints and allocated more weight to certain medical opinions than others.  Accordingly,

the hypothetical question to the vocational expert did not need to incorporate the additional limitations the ALJ had properly discounted.  *See Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010) ("[T]he ALJ was not obligated to include limitations from opinions he properly disregarded.")  Based on the Court's previous conclusion that the ALJ properly determined Plaintiff's limitations based on an appropriate weighing of the medical opinions, the hypothetical questions was proper and the VE's answer constituted substantial evidence supporting the ALJ's decision that Plaintiff is not disabled.  *See Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) ("Based on our previous conclusion . . . that the ALJ's findings of [Martise's] RFC are supported by substantial evidence, we hold that the hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.").

### RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.   Plaintiff's Motion for Summary Judgment (Doc. No. 12), be **DENIED**;

2.   Defendant's Motion for Summary Judgment (Doc. No. 14), be **GRANTED**; and

3.   The case be **DISMISSED WITH PREJUDICE**.


Date: January 12, 2015          *s/ Jeffrey J. Keyes*
                                JEFFREY J. KEYES
                                United States Magistrate Judge

Under Local Rule 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 26, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.